THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ADD WATKINS, Defendant-Appellant.

First District (5th Division)    No. 80-865

Opinion filed July 17, 1981.

890

Robert H. Aronson, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Stein, and Thomas G. DiCianni, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendant was convicted of delivering a controlled substance (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(b)) and sentenced to three years in the penitentiary. On appeal he raises these issues: (1) he was not proved guilty beyond a reasonable doubt; (2) certain items seized from him should not have been entered into evidence because they were the fruits of an illegal search; (3) the trial court erred in sustaining the prosecution's objection to defendant's testimony concerning a conversation he heard between two police officers; (4) defendant's privately retained counsel conducted the defense incompetently; and (5) defendant's sentence was excessive. We affirm.

On August 27, 1978, Investigator Richard Kolovitz of the Narcotics Division of the Chicago Police Department told fellow investigators Eugene Shepherd and James Brady that he had received information from a reliable informant concerning the sale of $10 packets of narcotics from a basement apartment at 3942 West Polk Street. Investigator Kolovitz requested the two officers to go to the apartment, undercover, to make a "buy." In preparing for the assignment, Investigators Shepherd and Brady photocopied a $10 bill to use in the narcotics purchase. They time-stamped the copy and left it at the police station.

At approximately 11 o'clock that night the two investigators, in plain clothes, approached the apartment building at 3942 West Polk Street. Investigator Brady hid in a gangway across the street from the building, where he could observe, while Investigator Shepherd continued walking to the apartment building. The door to the basement apartment was located under the front porch of the building, approximately 10 steps

below ground level. The door was secured on the outside by "burglar bars" that were attached by a large lock. There was a light in the center of the doorway. Reaching through the bars, Shepherd knocked on the door. When no one responded, he went back up the steps and talked to a man who was sitting on the front porch of the building. The man pointed to the nearby corner of Pulaski and Polk. Shepherd began walking toward the corner, where he noticed 7 to 12 persons standing around. Before he reached the corner, a man approached him and asked, "Who are you looking for?" Shepherd replied that he was looking for Jones in order to buy some heroin. The man, later identified as defendant, then identified himself as Jones and told the investigator to follow him. The two men walked back to 3942 West Polk, where defendant left Shepherd to wait on the sidewalk while he went downstairs to the basement apartment. Defendant unlocked the burglar gate, opened the door, and entered the apartment. He then relocked the gate and called Shepherd to come down the stairs. In exchange for the prerecorded $10 bill, defendant gave Shepherd a small tinfoil packet. Shepherd then left and went to his car, where Brady, who had been watching the transaction from his hiding place, met him. The two officers tested the substance in the foil packet and determined it was heroin. They returned to Area One Headquarters to inventory the packet and have it analyzed in the crime lab.

The following day, August 28, the investigators obtained a search warrant for the basement apartment at 3942 West Polk Street. The warrant also authorized the search of a male Negro, five feet seven inches, 169 pounds, approximately 35 years old, with a medium complexion and a thin mustache.

Investigators Brady, Shepherd, Kolovitz, and other officers of the unit left in separate cars to execute the warrant. Kolovitz and Brady, who were assigned to one of the undercover cars, received a radio call from Shepherd, which informed them he had seen the suspect sitting on a stool in front of 820 Pulaski Street. Shepherd waited for an acknowledgment of his message, then left to meet his supervisors in front of the Polk Street apartment. When he arrived, he accompanied several other officers to the basement apartment. The burglar gate was locked. The officers knocked on the door but received no response. They then pried open the burglar gate with a crowbar and sledge hammer to enter the apartment. No one was there. They searched the apartment but found no narcotics.

In the meantime, Officers Brady and Kolovitz had driven to 820 South Pulaski, where defendant was in front of a record shop along with six or eight others. The officers arrested defendant, searched him, and discovered a set of keys in his pocket. The officers advised him of his rights and told him he was being arrested for selling narcotics. The officers, in response to a radio message, then drove with defendant to the

Polk Street apartment. They entered the basement apartment and put defendant, handcuffed, into a chair. He denied having anything to do with the apartment. Officer Brady then took two sets of keys from defendant's pocket and discovered that one of the keys opened the lock on the burglar gate. The officers took defendant to Area One Head-quarters and searched him again. They found $253 in cash in his pocket. One of the bills matched the photocopy of the $10 bill that Officer Shepherd had used in purchasing the packet of heroin.

At trial, defendant presented several alibi witnesses. A longtime friend of defendant's, Mack Williams, testified that on August 27, 1978, at 3:30 p.m., he went to defendant's birthday party at the apartment of defendant's sister, Rosetta Miller. According to Williams, defendant and his wife arrived between 4 and 4:30 p.m. and left at about 11:45 p.m. He further testified that defendant stayed in the apartment during the entire time.

Defendant's sister, wife, and brother, Robert Watkins, also testified that they were present at the party with defendant. Their testimony was substantially the same as that of Mack Williams.

John Watkins, another of defendant's brothers, testified that he was renting the apartment at 3942 West Polk Street at the time of the occurrence. He further testified that defendant, who lived at 638 North Long Street, had keys to the apartment. John Watkins also stated that he had seen defendant in the Polk Street neighborhood numerous times during August of 1978.

Defendant also took the witness stand. He testified that he and his wife had arrived at his sister's apartment for the party between 4 and 4:30 p.m. They left at approximately 11:45 p.m. and went directly home to bed. Defendant denied selling narcotics to Officer Shepherd that night. He testified that he was arrested the next evening, August 28, 1978, when he stood in front of a pool hall at 806 South Pulaski with several other men. The officers frisked him and told him to get in the back seat of their car. Defendant testified that they drove to an alley where the officers took his money and his keys. They handcuffed him and put him back in the car. After waiting for 30 to 40 minutes, defendant testified, they drove to 3942 West Polk Street, where other officers were waiting. Leaving him in the car, the officers broke down the door of the apartment, entered, and searched it. Defendant further testified that they took him into the apartment, sat him in a chair, and asked him where the "dope" was located. Defendant answered that he did not know. Then the officers took him to the police station. Defendant stated that the officers told him that they would release him if he gave them "a better bust." When he refused, Officer Brady told him that he put his $10 bill in with defendant's money.

At the conclusion of the trial, the jury returned a guilty verdict against defendant. The trial court ordered a presentence investigation and set a date for the hearing.

At the sentencing hearing, the prosecution argued in aggravation that delivery of heroin, a Class 2 felony, was a "horrendous" crime. The assistant State's Attorney argued that heroin has destroyed many lives and that many criminal defendants are heroin users; that the court should send a message to defendant and others who sell or have sold heroin that the courts will not tolerate such destruction. He concluded by acknowledging that defendant had no previous convictions, but that he had an arrest record. He asked the court to sentence defendant to a period of incarceration in excess of the minimum sentence.

In mitigation, defense counsel presented to the court numerous affidavits in support of probation from defendant's friends and family. Whelma Burgiss testified in support of her affidavit. She said she was pastor of Range Memorial Baptist Church and had known defendant for over 10 years. She stated that if he were placed on probation her church would help him. The pastor of another church also testified, asking the court to be lenient.

Defense counsel argued that the 46-year-old defendant had never been charged with or convicted of a felony, that he had been married for 22 years, and that he had four children. He further stated that defendant had had a stable work record for 18 years, although he was unemployed at the time of the occurrence. He concluded by urging the court to sentence defendant to probation.

The trial court, after considering the pleas of defendant's witnesses, defendant's background, and the nature of the crime, stated that it was "considering" probation. However, the court sentenced defendant to the minimum prison sentence of three years, indicating that anyone who sells heroin, no matter how little the quantity, is guilty of a serious crime.

The trial court denied the motion to reduce the sentence and defendant brought this appeal.

## Opinion

Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt because of discrepancies in the police officers' identification evidence. We disagree.

Under the applicable law, the testimony of a single, credible witness will support a conviction as long as the witness "viewed the accused under such circumstances as would permit a positive identification to be made." (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 226, 367 N.E.2d 666, 668.) In the pending case, two police officers observed defendant during the narcotics sale on the night of August 27, 1978. Officer Shepherd spoke to

him and walked with him to the Polk Street apartment, where the transaction occurred. Officer Brady was watching these events from a hiding place across the street. The evidence indicates that the street lighting was bright and that both officers had a clear view of defendant. The officers' identification testimony would appear to satisfy the *Yarbrough* criteria, therefore, unless it can be concluded that their testimony was "vague, doubtful, and uncertain." (*People v. Kelley* (1971), 133 Ill. App. 2d 151, 155, 272 N.E.2d 825, 828.) Defendant argues that discrepancies in reports containing his physical description inject a reasonable doubt as to the identification of the man who sold heroin to police on August 27, 1978. In their written report of the August 27 occurrence, Officers Shepherd and Brady described a male Negro of 35 years, 169 pounds, five feet seven inches tall. In Officer Kolovitz' arrest report of August 28, however, defendant Add Watkins was described as being five feet 11 inches tall and 45 years old. He weighs approximately 200 pounds.

■■ We do not believe that these differences significantly undercut the officers' credibility or indicate that defendant was not the man that the officers observed on August 27. The first report was based on the officers' mere estimate of defendant's physical characteristics. The second report, written by a different officer, was completed following defendant's arrest and was presumably based on defendant's answers to questions regarding his actual birth date, height, and weight. Moreover, the central concern is not whether there are discrepancies in witnesses' descriptions of a defendant; rather, the courts must determine whether there existed an adequate opportunity for a witness to definitely identify the accused. (*People v. Sanders* (1976), 38 Ill. App. 3d 473, 348 N.E.2d 229.) If so, the discrepancies do not destroy the validity of an identification, but only go to the weight of the testimony. *People v. Sanders*; *People v. Bibbs* (1979), 74 Ill. App. 3d 721, 393 N.E.2d 28.

■■ Notwithstanding the above principles, defendant urges us to hold that trained police officers who observe a defendant during the commission of a crime should be expected to describe a party more accurately than would a crime victim whose memory might be impaired by the stress of the crime. We see no reason to hold police officers to a higher standard of perception, however, because the governing legal principle is that the credibility of all witnesses is for the factfinder to evaluate. (See *People v. Yarbrough*; *People v. Bibbs*.) In the present case the jury judged the identification testimony, along with defendant's alibi evidence, and determined that the State had carried its burden of proof. The State presented corroborative evidence, such as defendant's ownership of a key to the Polk Street apartment and the marked $10 bill, to support the identification testimony. On the record before us, we do not find the evidence to be so improbable as to raise a reasonable doubt of defend-

ant's guilt. Accordingly, we cannot upset the jury's verdict on the basis of the evidence.

Defendant next contends that his arrest was invalid and, consequently, the subsequent searches of his person were also unlawful. Therefore, he argues, the items seized from him, the keys and the prerecorded $10 bill, should have been suppressed in conformance with the fourth amendment's proscription against unlawful searches and seizures. We reject this contention, also.

■■ We initially note that defendant has failed to preserve this issue for review. The record contains no indication that he filed a motion to quash the arrest or to suppress evidence at any time before or during the trial. Nor does the post-trial motion allege that any evidence was inadmissible because defendant's arrest was illegal. Motions to quash arrests or suppress evidence generally must be made before or during the trial so the court has an opportunity to hold a hearing and rule on the issues. See *People v. Daniels* (1979), 75 Ill. App. 3d 35, 393 N.E.2d 667; see also *People v. Moore* (1969), 43 Ill. 2d 102, 251 N.E.2d 181 (constitutional claims may be waived).

■■ Even if defendant had not waived this issue, however, it is clear that his arrest was lawful because even without an arrest warrant,[1] an officer can make a valid arrest if he has reasonable grounds to believe that the person arrested is committing or has committed an offense. (Ill. Rev. Stat. 1979, ch. 38, par. 107—2(c).) This standard is equivalent to the Federal and State constitutional requirement of probable cause. (*People v. Scarpelli* (1980), 82 Ill. App. 3d 689, 402 N.E.2d 915.) As the facts indicate, the arresting officers in the pending case had probable cause to arrest the defendant based on their observance or knowledge that defendant had committed an offense on the night of August 27, 1978. Accordingly, the arrest was valid.

■■ Moreover, once an arrest is effectuated, police officers may conduct reasonable searches "incident" to the arrest. (See *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034; *People v. Hayes* (1973), 55 Ill. 2d 78, 302 N.E.2d 37.) As the United States Supreme Court has recognized, while a defendant is in the custody of a police officer, the officer may search that party to protect himself and to find and preserve evidence of the offense. (*E.g., Chimel v. California.*) We believe the searches of defendant in the present case fall within this exception to the requirement of a search warrant. When Brady arrested defendant, he conducted a protective "pat-down" of defendant. He found keys in defendant's pocket. Later, when defendant and the officers were at the

---

[1] Apparently, no arrest warrant ever issued. The officers obtained a search warrant for the Polk Street apartment, however, which included a description of defendant derived from the officers' report of August 27.

apartment, defendant denied having any connection with it. Officer Brady then removed the keys from defendant's pocket and found that one of them opened the lock on the burglar gate of the apartment. This key clearly linked defendant to the apartment; it was evidence which the officers properly took into their custody. At the police station, defendant was again searched, more thoroughly, and the police discovered a roll of money which included the $10 bill that had been given to defendant for the purchase of the packet of heroin. That the last two searches were not conducted during the initial arrest does not, as defendant implies, mean that the searches were not conducted incident to the arrest. In *United States v. Edwards* (1974), 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234, the court recognized that searches and seizures that could be made at the time of arrest may be legally conducted at a later time and different place. In *Edwards*, the defendant's clothes were seized 10 hours after his arrest, when it became clear to the police that the clothing was evidence of the crime charged. The court stated that in such circumstances "the police were entitled to take, examine, and preserve [the clothing] for use as evidence, just as they are normally permitted to seize evidence of crime when it is lawfully encountered." (*Edwards*, 415 U.S. 800, 806, 39 L. Ed. 2d 771, 777, 94 S. Ct. 1234, 1238.) The court concluded that taking his clothes was a "normal incident of a custodial arrest, notwithstanding the reasonable delay involved" and that the defendant was "no more imposed upon than he could have been at the time and place of the arrest * * *." *Edwards*, 415 U.S. 800, 805, 39 L. Ed. 2d 771, 777, 94 S. Ct. 1234, 1238.

Defendant's citation of *James v. Louisiana* (1965), 382 U.S. 36, 15 L. Ed. 2d 30, 86 S. Ct. 151, does not compel an opposite result. In *James*, after the defendant was arrested, he was taken to his home where, without a warrant, the police searched the home and found narcotics. The Court ruled that the warrantless search of the home was improper because, as a search of premises rather than the person of defendant, it was not substantially contemporaneous with or incident to the arrest. Other courts have recognized that "[w]hile the legal arrest of a person should not destroy the privacy of his premises, it does—for at least a reasonable time and to a reasonable extent—take his own privacy out of the realm of protection from police interest in weapons, means of escape, and evidence." *United States v. DeLeo* (1st Cir. 1970), 422 F.2d 487, 493, cited in *United States v. Edwards* (1974), 415 U.S. 800, 808-09, 39 L. Ed. 2d 771, 778, 94 S. Ct. 1234, 1239-40; see also *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.

■■ In the present case the evidence seized was part of defendant's personal effects, which he could have destroyed or thrown away. Under the circumstances the seizure of the keys and $10 bill was a justified and reasonable incident of his lawful arrest.

Defendant's third contention is that he was denied a fair trial because the trial court sustained the State's objection to defendant's testimony regarding a conversation he allegedly heard between two police officers. During redirect examination of defendant, counsel asked:

"Q. Now, when you were in the apartment and handcuffed and sitting down, there was a conversation that took place between Brady and [Kolovitz]. Were you able to overhear that conversation?

A. Yes, I was.

Q. And what was said between them?

MR. GREENBERG: Objection."

During a sidebar conference, defense counsel was given the opportunity to relate what he thought defendant would answer. He said, "I don't know; something about the money." The trial judge sustained the objection. The judge noted that defendant had not participated in the conversation. He further suggested that if such conversation had occurred, defense counsel should have questioned the officers when they testified earlier in the proceedings. Without citing any authorities, defendant now argues that the judge's ruling was "contrary to all rules of evidence of all jurisdictions."

■■■ The prosecution objected to the question as calling for inadmissible hearsay, which has been defined as "a statement made other than by a witness while at the trial or hearing, offered in evidence to prove the truth of the matter asserted." (S. Gard, Illinois Evidence Manual Rule 12:01 (2d ed. 1979).) While there are numerous exceptions to the hearsay exclusionary rule, defendant did not raise any of them as being applicable. Nor can we intuit, from the record, under which evidentiary rule the answer to defense counsel's question could be admitted. If defense counsel were attempting to impeach the police officers' credibility, he should have first laid a proper foundation by asking them about the alleged conversation when they testified. (*People v. Mayfield* (1979), 72 Ill. App. 3d 669, 390 N.E.2d 1315; *People v. Payton* (1966), 72 Ill. App. 2d 240, 218 N.E.2d 518.) Moreover, defense counsel's failure to make an offer of proof regarding the content of the alleged conversation removes the issue from our review. (*Mayfield.*) Without guidance from the record, we will not speculate as to the nature of the testimony that defendant sought to have admitted; accordingly, we hold that the judge's ruling was not erroneous and that defendant has waived his opportunity to demonstrate otherwise.

Defendant next argues that he was deprived of a fair trial because his attorney failed to adequately represent him. He cites three major errors of counsel: (1) failure to make a motion to suppress evidence; (2) failure to introduce the two conflicting police reports into evidence; (3) certain prejudicial remarks made by defense counsel during closing arguments. This argument cannot withstand scrutiny.

■■ Regarding the first point of counsel's error, we have already discussed the legality of defendant's arrest. Having held that it was based on probable cause, we further found the subsequent searches of defendant to be lawfully incident to the arrest. Therefore, we cannot say that counsel's failure to move the court to suppress the keys and the $10 bill seized from defendant constituted inadequate representation or resulted in any prejudice to defendant. See *Bibbs*.

With respect to defense counsel's second alleged error, failure to introduce the police reports into evidence, we note that written police reports are not generally admissible because they constitute hearsay or state conclusions. (*Walls v. Jul* (1969), 118 Ill. App. 2d 242, 254 N.E.2d 173; see Ill. Rev. Stat. 1979, ch. 110A, par. 236(b).) Police reports may be used to refresh the officer's recollection (see *Jacobs v. Holley* (1972), 3 Ill. App. 3d 762, 279 N.E.2d 186) or for impeachment purposes. In addition, a report containing an officer's physical observation and measurements may be admitted, in the trial court's discretion, for clarification of the testimony. (*Walls v. Jul* (trial court did not abuse its discretion in admitting a diagram contained in a police report).) On the other hand, admitting police reports into evidence may be reversible error in certain circumstances. For example, in *Noumoff v. Rotkvich* (1967), 88 Ill. App. 2d 116, 232 N.E.2d 107, police reports were admitted into evidence under the past recollection recorded exception to the hearsay rule. The appellate court reversed, however, holding that the record did not establish the two prerequisites for admitting documents under this rule: (1) that the witness has no independent recollection of the facts; and (2) after reading the document the witness has been unable to refresh his memory. *Noumoff*, 88 Ill. App. 2d 116, 121, 232 N.E.2d 107, 109.

■■ In the instant case, defendant's counsel questioned the police officers regarding their reports and fully argued to the jury the discrepancies in the physical descriptions of defendant which were recorded in the reports. Accordingly, the jury had all the evidence of that issue before it. Thus, even if the reports could have been properly admitted into evidence, they would have had a cumulative effect only. Therefore, counsel's failure to introduce them into evidence could not have resulted in reversible error. See *Douglas v. Chicago Transit Authority* (1972), 3 Ill. App. 3d 318, 322, 279 N.E.2d 44, 46; *Jacobs v. Holley* (1972), 3 Ill. App. 3d 762, 279 N.E.2d 186.

It is defense counsel's closing argument, however, that defendant believes reduced his trial to the sham or farce level that necessitates a new trial. (See *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Bibbs* (1979), 74 Ill. App. 3d 721, 393 N.E.2d 28.) Defendant concedes that his counsel represented him competently throughout most of the trial proceedings. However, he believes counsel abandoned him during clos-

ing arguments by telling the jury that the State had a "very strong case" against his client. Defendant characterizes this remark as a "flagrant denial of due process."

After studying the relevant portions of the transcript, we conclude that defendant's charge that his counsel sold him out at the eleventh hour is not only unfounded but unfair. The tenor of counsel's closing argument was to pinpoint the flaws in the State's case and emphasize the strength of the defendant's alibi evidence. He criticized the police procedures involving the handling of the prerecorded $10 bill and questioned their failure to arrest the narcotic seller immediately following the sale instead of waiting until the next day. In one instance, counsel remarked that the "police officers have put together a very solid case here where this mysterious ten dollar bill that's been pre-recorded and recorded [*sic*]. The only thing the police officers didn't know * * * or couldn't have known was that Add Watkins was attending a party in the presence of five or six other witnesses at the time and place that this sale was supposed to have taken place."

It is obvious that in the context of the whole argument, defense counsel's references to the State's "strong" case were intended sarcastically. Indeed, it is highly implausible that trial counsel would suddenly abrogate his rigorous defense by seriously agreeing that the prosecution had a strong case against defendant. Nor do we believe the jury was incapable of perceiving defense counsel's meaning.

■■ In light of the above analysis of defense counsel's conduct, it is clear that defendant has not established the necessary "actual incompetence as reflected by the representation and substantial prejudice resulting therefrom." (*People v. Bibbs* (1979), 74 Ill. App. 3d 721, 724, 393 N.E.2d 28, 31.) We conclude that defendant was effectively represented during his trial.

■■ ■ Defendant finally contends that his three year sentence is manifestly excessive in view of his background and potential for rehabilitation. The proper standard for appellate review of sentencing is limited to whether the trial court abused its broad discretionary powers to fit the sanction to the crime.[2] (*People v. Perruquet* (1977), 68 Ill. 2d 149, 156, 368

---

[2] Although defendant argues that his sentence is so excessive as to violate his rights under article 1, section 11 of the Illinois Constitution, we disagree. The broad, general language of this section states that "penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Our Criminal Code is an extensive classification system which provides guidelines for courts to follow in imposing sentences. The legislature has determined that three years' imprisonment is an appropriate minimum sanction for certain offenses, including the one in issue. (Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—1(a)(5).) For us to conclude that defendant's sentence is *per se* invalid under the constitution, therefore, we would effectively repeal a portion of the Criminal Code. Such a result is unwarranted.

902

N.E.2d 882, 883; *People v. Jenkins* (1980), 88 Ill. App. 3d 719, 410 N.E.2d 1145.) Under our statutory scheme, the offense of delivering a controlled substance is a Class 2 felony. (Ill. Rev. Stat. 1979, ch. 56½, par. 1401(b).) To alter the sentence in the pending case, we would have to find that the trial court abused its discretion in entering the minimum prison sentence for a Class 2 felony. This we cannot do. The trial court stated that it had considered defendant's background, age, family status, and paid "careful attention to all the affidavits" offered in mitigation of the sentence. The court also considered, as it must, the severity of the offense and the prosecution's plea for a sentence in excess of the statutory minimum. The court's ultimate conclusion that the minimum prison term was appropriate, we find, was not an abuse of discretion. (See Ill. Rev. Stat. 1979, ch. 56½, par. 1411.) Consequently, we have no power to alter the sentence.

For the foregoing reasons, we affirm the judgment of the trial court.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.